[Crim. No. 34886. Second Dist., Div. One. Apr. 2, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL RODRIGUEZ, Defendant and Appellant.

COUNSEL

Paul Arthur Turner, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Weisman and Carla M. Singer, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**JEFFERSON (Bernard), J.***—Defendant was charged with the felony offense of murder in violation of section 187 of the Penal Code. His motion to suppress evidence of a letter written by him to his wife while they were both inmates in jail was denied. He waived jury trial. The court found him guilty of second degree murder; probation was denied. Defendant was sentenced to state prison for the upper term of 7 years; credit was allowed for time served in custody in the amount of 252 days, and 42 days were allowed for good time credit.

Defendant appeals from the judgment of conviction. He advances the following contentions in an effort to overturn his conviction: (1) that the trial court erred in denying his motion to suppress evidence of the interspousal jail letter; (2) that the trial court erred in considering the letter when denying probation to defendant; and (3) that he was entitled to additional sentence credit of 42 days for *work* time while in county jail custody. (Pen. Code, § 4019, subd. (b).)

I

*The Factual Summary*

On May 28, 1978, about 2:30 p.m., defendant and his wife entered the Hi-Out Tavern in Goleta. Andrew Saavedra, the victim, was there and purchased a drink for defendant and the latter's wife. Saavedra and defendant played pool. Defendant drank three beers and three shots of tequila; Saavedra had four drinks. Defendant asked Saavedra about a woman whom defendant thought was Saavedra's sister; a discussion ensued and Saavedra said: "Don't talk about my family." Saavedra grabbed defendant's shoulder. Defendant pushed Saavedra's hand away and told him to "shut up." Saavedra became angry, stood up, and said: "I told you, don't talk about my family." Saavedra grabbed defendant, and defendant tried to push him away. Defendant pulled out a knife. Defendant's wife tried to stand between the two men. Defendant then slashed Saavedra with the knife and stabbed him repeatedly. After the slashing and stabbing, defendant left the tavern.

An autopsy performed on the victim's body revealed sixteen knife wounds; of these, nine were stab wounds, and the others were slash

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

wounds. The cause of death was stated to be the result of extravasation which, according to the autopsy physician, meant that the victim bled to death from the large number of wounds.

Other evidence presented by the prosecution tended to establish that about five months before the killing of Saavedra, defendant was arrested for driving under the influence of alcohol; that on this occasion, a shotgun was found under the seat of his car and three shotgun rounds were located in one of his pockets; the shotgun was loaded and its safety was off. After an appropriate waiver of rights, defendant remarked that he intended to do bodily harm to Saavedra with the shotgun.

Defendant predicated his defense to the murder charge upon self-defense, heat of passion, and incapacity to form the requisite intent for murder. He introduced evidence that, over a period of time prior to the killing, Saavedra and defendant's wife frequently visited barrooms and other places together; that Saavedra was barred from drinking at one barroom for using profanity. Defendant's hand was cut in a previous fight with Saavedra. Defendant's evidence also tended to establish that the victim drank heavily, had a .22 blood alcohol level soon after the stabbing, and was addicted to methadone use.

Defendant testified that he first met his wife in a barroom, and, soon after meeting her, he had a fight with Saavedra. The evening after he first met his wife, Saavedra attempted to use a knife on him. Defendant stated that he believed Saavedra was giving heroin to defendant's wife; that he told Saavedra to stop giving her heroin. While they were playing pool on the night of the stabbing, Saavedra began to bully him. Defendant was afraid of Saavedra because he had the impression that Saavedra usually carried a knife. Defendant said that Saavedra struck him with his fist, and that defendant then stabbed Saavedra. Defendant also testified that he was previously a heroin addict and had a drinking problem.

A psychiatrist, called as a witness by defendant, testified that at the time of the stabbing, defendant did not have the capacity to meaningfully and maturely reflect upon the consequences of his conduct, could not premeditate, and, in "good probability," could not form the necessary mental intent for malice. In rebuttal, the prosecution called a psychiatrist who testified that, at the time of the stabbing, defendant was able to meaningfully and maturely premeditate and deliberate, had the capacity to form a specific intent to kill, and could appreciate the

requirement that his conduct must conform to law. Also, in rebuttal, a bartender testified for the prosecution that she had known the victim for a year and a half, and, in her opinion, he had a character trait for nonviolence.

II

*The Admissibility of the Jailhouse*
*Interspousal Letter in the Face of*
*a Claim of the Marital*
*Communications*
*Privilege*

Extensive evidence was presented at the hearing on defendant's motion to suppress evidence of the letter (exhibit X-3 at hearing) written by defendant to his wife while they were both inmates in jail.

When defendant was booked into jail he signed the following written statement with respect to mail: "I hereby authorize the Sheriff and Jailer to receive and open all my mail while I am confined to the Santa Barbara County Jail." There was evidence that it was customary practice of the correction officers at the jail to read correspondence between inmates in order to find contraband and escape plans; and codefendants were not permitted written communication concerning their cases.

In the period of jail custody prior to July 3, 1978, defendant wrote three or four letters a week to his wife. He folded them and put them on the cell bars. The letters were not put in envelopes. A jail officer routinely picked up the letters; they were then placed on a counter in the women's section of the jail. One jail officer testified that there was no jail rule prohibiting officers from reading letters folded in such manner and not sealed. Another officer testified that when he picked up defendant's folded letters, he read each letter and then put it in its appropriate place; he also testified that exhibit X-3 was written in defendant's handwriting.[1] Also, defendant had personal meetings with his wife in a booth in the jail on Wednesdays and weekends.

---

[1] In the trial court, the motion to suppress the letter was predicated upon inadequate foundation for authentication as well as the marital privilege for interspousal communications. The trial court found that there was sufficient foundation for authentication and admissibility of the letter. On appeal, no contention is made as to inadequacy of foundation for admissibility.

On July 3, 1978, defendant left a folded, unsealed letter—exhibit X-3—on the cell bar.[2] The letter consisted of two handwritten, folded sheets. The letter contained statements to the effect that defendant had deliberately killed Saavedra. The name of defendant's wife—Betty Rodriguez—was written on a fold in the letter. This letter constituted damaging evidence against defendant unless its admissibility was precluded by the marital privilege for confidential communications.

Apparently, an officer picked up the folded letter from the cell bars and delivered it to the counter in the women's section. In the early morning hours of July 5, a female jail officer, Weirum, found the folded letter on the counter, and saw thereon the name of Betty Rodriguez who was in custody in the women's section at that time. Officer Weirum unfolded the letter, read it, and gave it to her commanding officer who gave it to the senior jail officer in charge of in-jail investigations.

At the hearing of the suppression-of-evidence motion, defendant testified that while he and his wife were in jail they had face-to-face meetings and also corresponded in writing. He stated that when he conversed with her in the booth provided for that purpose, he was not told that officers would listen to or tape the conversations. He also said that he wrote and passed letters to his wife without using the United States mail until he was told by someone that his letters were too "nasty." Then he realized that his letters were being read. Defendant also testified that a few weeks after his arrival at the jail on June 3, 1978, and prior to July 3, 1978, he asked an officer, Mitchell, whether they would read his letters to his wife. He also asked another officer, Pericola, the same question. One of these officers said that he did not read the letters while the other officer replied that he checked them for contraband, but did not read them.

On cross-examination at the suppression-of-evidence hearing, defendant testified that he signed the written statement authorizing the sheriff and jailer to open his mail. When he first sent letters to his wife through the jail, he had not inquired whether anyone would read them. He did not ask Officer Pericola about jail communications; rather, "it came out" when the officer picked up one of his letters and read it.

---

[2]The letter was dated "Monday night," and it stated that he had just been moved to a cell in 14. There was evidence that he was moved to that cell on July 3, 1978; the court took judicial notice that July 3, 1978, was a Monday.

Officer Pericola did not tell him about the marital communication privilege.

██ It is defendant's thesis that the marital privilege for confidential communications between spouses was applicable to the letter in question which he wrote to his wife. (See Evid. Code, § 980.) The People's position is that the privilege never became applicable because defendant *never* intended for his communication to be confidential. In addition, the People assert that defendant waived any privilege by executing a prior consent in writing for the jail personnel to read his mail. Defendant counters this position of the People by asserting that the waiver, if any, was coerced.

We begin our discussion by pointing out that jailhouse communications of inmates are generally treated in a different fashion than are communications made by persons in a free setting. ██ It is now settled law that a person detained in jail cannot reasonably expect to enjoy the privacy afforded to a person in free society; his lack of privacy is deemed a necessary adjunct to his imprisonment. (*North* v. *Superior Court* (1972) 8 Cal.3d 301, 309 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; *People* v. *Santibanez* (1979) 91 Cal.App.3d 287, 290 [154 Cal.Rptr. 74].) Thus, it has been held by the courts of this state that, except in limited circumstances involving a special relationship, an incarcerated person has no reasonable expectation of privacy in ordinary jailhouse conversations. (See *People* v. *Hill* (1974) 12 Cal.3d 731, 764-765 [117 Cal.Rptr. 393, 528 P.2d 1]; and *North* v. *Superior Court, supra*, 8 Cal.3d 301, 308-309.)

Does the relationship between a person in custody and his spouse constitute such a special relationship so as to provide a reasonable expectation of privacy in ordinary jailhouse conversations?

In *North* v. *Superior Court, supra*, 8 Cal.3d 301, 311, officers secretly tape recorded a conversation between a *visiting* wife and her inmate husband in a detective's private office in the facility "under circumstances which strongly indicate that petitioner [husband] and his wife were lulled into believing that their conversation would be confidential." It was held that, under the circumstances presented, the husband inmate had a reasonable expectation that his conversation was, and would remain, private and confidential. Hence, the tape recording was protected by the marital communication privilege (Evid. Code, § 980) and the husband was entitled to have the tape recording suppressed.

The *North* case is significant in that the court points out that, normally, the marital communication privilege does *not* protect from disclosure a *jailhouse* conversation between an inmate and his spouse since an inmate cannot expect any right of privacy for such a conversation. "[N]othing in our opinion should be deemed a disapproval of the common practice of monitoring inmates' conversations with others, including their spouses, in visiting rooms or similar places. That practice seems reasonably necessary in order to maintain jail security and (with the exceptions set forth in Pen. Code, § 636, *supra*), is not proscribed by law." (*North, supra*, 8 Cal.3d 301, 312; fn. omitted.)

Two years after *North*, the Supreme Court decided *People v. Hill, supra*, 12 Cal.3d 731. In *Hill*, there was a police-monitored and tape-recorded jailhouse conversation between a defendant and his wife which took place in a common visiting room of the jail over an intercom system. The *Hill* court held that the *North* court's decision did not require evidentiary exclusion of the tape-recorded conversation found in *Hill*. The *Hill* court emphasized that the record before the court disclosed no evidence that the jail officers had created any expectation or belief by the husband inmate that the interspousal communication would be private.[3]

In the case at bench, we do not have an *oral* jailhouse communication between spouses such as was involved in *North, Hill* and *Santos*. But the principle of a *lack* of any reasonable expectation of privacy by a jail inmate in his jailhouse *oral* communications to a spouse would seem to apply equally to a *written* communication from a jail inmate to his spouse who is also in custody or to a spouse who is not in custody. Thus, defendant is unable to claim that his letter was *reasonably* intended by him to be a *confidential* communication to his wife

---

[3]In *People v. Santos* (1972) 26 Cal.App.3d 397, 400 [102 Cal.Rptr. 678], a defendant was prosecuted for murder. On a visit to the jail by the defendant's wife, the defendant, in a telephone intercom conversation with her, whispered that the phones were bugged but said: "Get rid of it"; and the wife replied: "Okay, I'll sell it." It was held that the police tape recording of this conversation was admissible against the defendant in spite of his assertion of the marital privilege for confidential communications. The *Santos* case is a stronger case for the denial of the privilege than that found in *Hill*, since, in *Santos*, the defendant was obviously aware that his conversation was being monitored and, hence, that it could *not* be intended to be a *confidential* communication. In addition, the *Santos* communication brought into play the *exception* to the marital privilege for confidential communications set forth in Evidence Code section 981, in that the communication was made to *enable* or *aid* his spouse to commit the crime of destruction or concealment of evidence—a violation of Penal Code section 135.

unless the evidence establishes that the jail officers led him to this belief within the principle enunciated by the *North* court. There is no such evidence in the record before us.

On the contrary, the evidence is capable of the interpretation that there was a lack of any reasonable expectation by defendant of the right of privacy. Both defendant and his spouse were inmates. When he was admitted to jail, he signed a written statement authorizing the opening of his mail by jail personnel, and he left the letters unsealed on the cell bars for delivery. There was no testimony that defendant had been informed in any way specifically that his written communications to his wife would *not* be read by jail officers. Certainly, defendant's testimony that two jail officers advised him that they did not read inmates' letters such as defendant's letter to his wife was capable of interpretation that defendant was being led to believe that his communications to his wife were confidential. But the trial court did not, and was not required to, place this interpretation upon defendant's testimony.

■ In reviewing a determination of a trial court on a motion to suppress evidence, the function of the reviewing court is to determine whether there was substantial evidence to support the trial court's findings (*People* v. *Waters* (1973) 30 Cal.App.3d 354, 359 [106 Cal.Rptr. 293]); and all factual conflicts must be resolved in the manner most favorable to the trial court's disposition on the motion. (*People* v. *Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161].) ■ Here, the evidence supports the finding that defendant and his wife did not have any reasonable expectations of privacy as to their interspousal communications.

In holding that a married jail inmate cannot generally claim the marital privilege for confidential communications with respect to oral or written communications between the inmate and the inmate's spouse, the courts have balanced the competing interests of the need for jail security and the need for privacy between spouses in favor of jail security. Reasonable minds might well differ on whether it is necessary for the policy undergirding the creation of the marital communications privilege to be subordinated to the policy necessitating rules of jail security in the jailhouse setting. But if married jail inmates are to have the benefit of the marital privilege for confidential communications in their jailhouse communications with their spouses except under the special circumstances sanctioned by *North*, it must come through a modification by the high court of the views espoused in *North*.

Defendant asserts that the existence of the marital privilege for confidential communications should be recognized for married jail inmates generally and the only question at issue should be that of waiver. Defendant then argues that any alleged waiver of the privilege by defendant's consent to disclosure should be deemed nullified as a coerced waiver. We do not reach this positing of the issue by defendant since, as we have articulated above, the existence of the marital privilege for confidential communications for married jail inmates has been refused recognition by the state's high court in *North* and *Hill* except for the limited circumstances set forth in *North.* There is no need, therefore, for any discussion by us of the principles of waiver and coercion.[4]

## III

### *Reliance by the Trial Judge Upon Defendant's Letter in Denying Probation*

Defendant advances the point that the trial court should not have relied upon the incriminating letter in denying his request for probation. In the instant case, the trial court stated 12 specific reasons for denying probation. The 11th stated reason was that defendant did not appear remorseful of the commission of the offense as revealed by his letter to his wife and its implications.

But the other stated reasons included the following matters: the danger to other persons if he were not imprisoned; the nature and seriousness of the crime, including the savagery of the attack and the gruesomeness of the killing; the vulnerability of the victim to savagery of the attack in that the victim was small, young, and apparently of slow movement as a result of intoxication; the fact that defendant was armed with a skinning knife, a deadly weapon; the victim was bare

[4]Evidence Code section 912 provides for waiver of the various confidential communications privileges through a disclosure by the holder of the privilege or the holder's consent to disclosure by another of a significant part of a communication. The privileges subject to this type of waiver include those provided by Evidence Code sections 954 (lawyer-client privilege), 980 (privilege for confidential marital communications), 994 (physician-patient privilege), 1014 (psychotherapist-patient privilege), 1033 (privilege of penitent), and 1034 (privilege of clergyman). Section 912 provides specifically that, in order for a waiver of the privilege to take place, the holder of the privilege must act "without coercion" in making a disclosure of a portion of the communication or in consenting to a disclosure by another.

handed; the fact that after disabling the victim by slashing the victim's face, defendant inflicted multiple stab wounds to the victim's body, resulting in death by exsanguination; the crime was committed without sufficient provocation, indicating likely recurrence; the manner of commission of the crime indicated sophistication and professionalism by defendant in a knife fight; the prior record of defendant included recent and frequent crimes, indicating regular and increasingly serious conduct; defendant was on probation at the time of commission of the offense; and there was danger in defendant's use of alcohol.

We conclude that even if the trial court had paid no attention to the letter and had found that defendant was remorseful the other stated grounds for denial of probation amply supported the decision to deny probation to defendant. It is manifest on the record before us that the trial court did not abuse its discretion in denying probation.

### IV

#### Sentence Credits

As previously indicated, defendant also urges that he is entitled to work time credit for time spent in presentence custody. We need not deal with this issue as defendant should be able to obtain any relief to which he is entitled through the administrative procedure provided by the Department of Corrections. (See *People* v. *Sage* (1980) 26 Cal.3d 498 [165 Cal.Rptr. 280, 611 P.2d 874].)

The judgment is affirmed.

Lillie, Acting P. J.,[5] and Radin, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 1, 1981. Bird, C. J., did not participate therein.

---

[5]This opinion was originally filed on November 12, 1980, with the identical panel and subsequently (Nov. 21, 1980) modified. Defendant petitioned for a hearing before the California Supreme Court.

On March 5, 1981, the California Supreme Court filed the following order: "Petition for hearing granted. The cause is transferred to this court and retransferred to the Court of Appeal, Second District, Division One, for re-issuing of its opinion with the appropriate designation of Lillie, J., as Acting Presiding Justice. (Cal. Const., art., VI, § 3.)"

*Assigned by the Chairperson of the Judicial Council.