[L.A. No. 31424. Nov. 21, 1983.]

KENNETH LEE DONALDSON, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Wilbur F. Littlefield, Public Defender, Dennis A. Fischer, Laurence M. Sarnoff, Charles Gessler and Morton P. Borenstein, Deputy Public Defenders, for Petitioner.

Quin Denvir, State Public Defender, Handy Horiye and Harriet Wiss Hirsch, Deputy State Public Defenders, Daniel Costello, Philip H. Pennypacker and James S. Thomson as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

John K. Van de Kamp and Robert H. Philibosian, District Attorneys, Harry B. Sondheim, Donald J. Kaplan and George M. Palmer, Deputy District Attorneys, for Real Party in Interest.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and John W. Carney, Deputy Attorneys General, as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**BROUSSARD, J.**—Defendant Kenneth Lee Donaldson, charged with murder involving special circumstances, robbery, and burglary, seeks a writ of mandate to compel respondent superior court to grant his motion to suppress evidence. He asserts that the use of a hidden microphone to record a conversation between him and his brother Lester while they were waiting in a police interview room constitutes an unlawful search under both federal and California law.

We explain that under settled federal precedent and under the California decisions prior to *De Lancie v. Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142], the secret monitoring and recording of unprivileged conversations in prisons, jails, and police stations did not constitute an unlawful search. *De Lancie* held that such monitoring was unlawful unless done to protect institutional security. Because the purpose of *De Lancie* would not be furthered by applying its holding retroactively, we conclude that *De Lancie* does not govern police conduct that took place before that decision was filed. We therefore deny defendant's petition for writ of mandate.

1. *Summary of facts and proceedings below.*

On the morning of September 15, 1980, someone broke into the Wise Owl Pre School and killed Mattie Chissell, one of the teachers. About three weeks later, on October 6, Lester Donaldson, defendant's brother, was present at the southeast police station as a potential witness, not a suspect, and was not under arrest.

Later that same day defendant telephoned the station and then went voluntarily to the police station where he, too, was considered a potential witness.[1] A police officer brought defendant to interview room 109 where Lester was seated, and told defendant, "Have a seat and we will be with you in a minute," or words to that effect. Lester and defendant were then left alone in the room with the door closed.

---

[1] Our account of the police monitoring of the Donaldson brothers' conversation is based entirely on the police officers' testimony. Neither defendant nor his brother testified at the suppression hearing.

Room 109, like the other interview rooms, is bugged to permit the police to overhear and record conversations. After leaving the brothers alone in that room, the police listened to their conversation, and apparently heard and recorded statements by defendant incriminating him in the Chissell murder.[2]

Defendant moved to suppress the recording and other evidence of the overheard conversation. At the evidentiary hearing, which occurred before our *De Lancie* decision, defendant emphasized the fact that neither he nor his brother was in custody. The prosecutor in reply asserted that the location of the conversation, not the status of the conversants, was the controlling factor, and that neither brother could expect privacy in a police interview room. The trial court agreed and denied the motion to suppress.

We issued an alternative writ of mandate to consider defendant's petition in connection with *De Lancie,* which was then pending before this court. Our *De Lancie* decision, while upholding a cause of action for injunctive relief, left unsettled questions concerning the suppression of evidence in criminal cases, particularly those in which the challenged monitoring took place before *De Lancie* was filed. Because we conclude that the *De Lancie* principles should not apply to conversations monitored before that decision was filed, we do not address whether suppression of evidence is a proper remedy for conversations monitored in violation of *De Lancie.* We address the retroactivity of *De Lancie* following our discussion of defendant's claim that the proferred evidence was seized in violation of federal search and seizure law.

### 2. *Admissibility of the evidence under federal law.*

■ Defendant's claim that admission of the intercepted conversation violates the Fourth Amendment cannot surmount the decision of the United States Supreme Court in *Lanza* v. *New York* (1962) 370 U.S. 139 [8 L.Ed.2d 384, 82 S.Ct. 1218]. The police surreptitiously recorded a visiting room conversation between Lanza and his jailed brother. Lanza later refused to answer questions based on the secret recording in a hearing before a legislative investigating committee. After upholding Lanza's conviction on independent grounds, the Supreme Court added that in any case Lanza could not rely on the Fourth Amendment in refusing to answer the committee's questions because the location of the recorded conversation, a jail visiting room, was not a protected area.

---

[2]The alleged incriminating statements are not part of the record before us on defendant's petition for mandate.

The court stated that "to say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search and seizure of his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amendment protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's 'house,' and so, of course, may an apartment. An automobile may not be unreasonably searched. Neither may an occupied taxicab. Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day. Though it may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection, there is no claimed violation of any such special relationship here." (Pp. 143-144 [8 L.Ed.2d at pp. 387-388]; fns. omitted.)[3]

In 1967, however, *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], declared that "the Fourth Amendment protects people not places . . . . [W]hat [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." (Pp. 351-352 [19 L.Ed.2d at p. 582].) Justice Harlan's explanation of this language has proved particularly influential. The cases, he stated, establish "a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'." (P. 361 [19 L.Ed.2d at p. 588], conc. opn. of Harlan, J.)

Because *Lanza* epitomized the "protected areas" type of analysis repudiated by *Katz,* commentators have questioned whether the earlier decision retains vitality. (See 3 La Fave, Search and Seizure (1978) § 10.9; Giannelli & Gilligan, *Prison Searches and Seizures: "Locking" the Fourth Amendment Out of Correctional Facilities* (1976) 62 Va.L.Rev. 1045.) Federal courts, however, have consistently followed *Lanza* and upheld admission of monitored conversations in jails or police stations. "It still appears to be good law that so far as the Fourth Amendment is concerned, jail officials are free to intercept conversations between a prisoner and a visitor. This was the ruling in *Lanza* v. *New York* [citation] and it appears to have survived *Katz* v. *United States* [citation]." (*United States* v. *Paul* (6th Cir.

---

[3]Although the quoted language from *Lanza* refers to jails, later decisions apply the same analysis to police station interview rooms. (See *Williams* v. *Nelson* (9th Cir. 1972) 457 F.2d 376, 377; *North* v. *Superior Court* (1972) 8 Cal.3d 301, 308-309 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155].)

1980) 614 F.2d 115, 116 [61 A.L.R. Fed. 816], cert. den. 446 U.S. 941; see *United States* v. *Hearst* (9th Cir. 1977) 563 F.2d 1331, 1345, cert. den. 435 U.S. 1000, and cases there cited; *Christman* v. *Skinner* (2d Cir. 1972) 468 F.2d 723, 726.)

There are signs that the federal courts may move away from *Lanza*'s total rejection of privacy in a jail or police station, and may ultimately adopt the *De Lancie* position limiting evesdropping to that required for institutional security. In *Bonner* v. *Coughlin* (1975) 517 F.2d 1311 [32 A.L.R.Fed. 585], certiorari denied 435 U.S. 932 [55 L.Ed.2d 529, 98 S.Ct. 1507], Justice Stevens, writing for the Seventh Circuit, stated that although "the justifiable reasons for invading an inmate's privacy are both obvious and easily established[,] [w]e are persuaded . . . that the surrender of privacy is not total and that some residuum meriting the protection of the Fourth Amendment survives the transfer into custody." (P. 1316.) And *United States* v. *Hearst, supra,* 563 F.2d 1331, described the post-*Katz* cases as permitting only "[a]n intrusion by jail officials pursuant to a rule or policy with a justifiable purpose of imprisonment or prison security" (p. 1345), but upheld the evidence in that case on the ground that "[h]ere the government adequately established that its practice of monitoring and recording prisoner-visitor conversations was a reasonable means of maintaining prison security." (P. 1346.)

Despite these precursors, no federal case has repudiated the *Lanza* dictum or excluded a jail or police station conversation from evidence. (See 3 La Fave, *op. cit. supra,* § 10.9, p. 418.) If occasional state court cases such as *De Lancie* take a different course, they do so on state, not federal, grounds. Bound in matters of federal law by the United States Supreme Court, which has never rejected its dictum in *Lanza* v. *New York,* and influenced by the decisions of the lower federal courts, we are impelled to conclude that the *Lanza* dictum continues to control in federal law.

Under *Lanza,* the fact that neither defendant nor his brother was in custody does not advance defendant's claim. *Lanza* does not rest upon the concept that a prisoner loses civil rights upon arrest or conviction. (Lanza himself was a visitor at the jail, not an inmate.) The decision, instead, asserts that there is no right of privacy—in post-*Katz* terminology, no justifiable expectation of privacy—in detention facilities, regardless whether the particular defendant involved was detained or voluntarily present.

3. *Admissibility of the evidence under pre-De Lancie California law.*

California decisions before *De Lancie* followed the pattern of the federal decisions, admitting the challenged evidence in virtually all cases. In the leading case, *North* v. *Superior Court, supra,* 8 Cal.3d 301—the only case

to exclude a monitored conversation—North was detained in jail awaiting trial. When his wife came to visit him in jail, Detective Neesan invited them into his private office, left them there with the door closed, and secretly monitored their conversation. North sought to exclude the conversation on two grounds: unreasonable search under the state and federal Constitutions, and violation of the privilege extended by Evidence Code section 980 to confidential marital communications.

Our opinion first noted that "prior California cases have uniformly held that an inmate of a jail ordinarily has no right of privacy." (P. 308.) Even marital communications, we explained, were not protected: "[i]n view of the general rule that an inmate of a jail or prison has no reasonable expectation of privacy, . . . an ordinary jailhouse conversation between spouses could not be deemed to have been 'made in confidence,' as required by Evidence Code section 980 . . . ." (P. 311.)

*North* went on, however, to observe that the conversation in question occurred "under circumstances which strongly indicate that petitioner and his wife were lulled into believing that their conversation would be confidential. Although the record does not disclose whether or not Neesan made any representations to that effect, his admitted conduct spoke as clearly as words—first by surrendering to petitioner and his wife Neesan's own private office so that they might converse and then by exiting and shutting the door, leaving them entirely alone. Certainly, nothing in Neesan's actions indicated that petitioner's conversation would be monitored. The foregoing circumstances, coupled with the statutory presumption that a conversation between spouses is presumed to have been made in confidence (Evid. Code, § 917 . . .), constituted a sufficient showing by petitioner to establish a reasonable expectation of privacy." (Pp. 311-312.)

We concluded by emphasizing "that nothing in our opinion should be deemed a disapproval of the common practice of monitoring inmates' conversations with others, including their spouses, in visiting rooms or similar places. That practice seems reasonably necessary in order to maintain jail security and (with the exceptions set forth in Pen. Code, § 636, *supra*), is not proscribed by law." (P. 312, fn. omitted.)

The *North* opinion stood on two grounds: the marital privilege and the deliberate creation of an expectation of privacy. In the following year the Court of Appeal addressed the question whether the creation of an expectation of privacy alone would require exclusion. In *People* v. *Finchum* (1973) 33 Cal.App.3d 787 [109 Cal.Rptr. 319], the sheriff put two codefendants in an interview room and asked, " '[I]f I left them together for ten or fifteen minutes, could they get their stories straight . . . ?' " (P. 789.)

He then went to another room to monitor the conversation. Reversing an order suppressing evidence, the court stated that "the defendant and his companion did not occupy a privileged status. In *North* it was the husband-wife relationship coupled with Detective Neesan's conduct that gave rise to the expectation of privacy. Absent the privileged relationship from the *North* case, as we read that case, there would have been no reasonable expectation of privacy." (P. 791.)

During the 10 years following *North,* all attempts to suppress conversations based upon unprivileged relationships failed. (See *In re Joseph A.* (1973) 30 Cal.App.3d 880, 885-886 [106 Cal.Rptr. 729] (defendant's conversation with his uncle in police interview room); *People* v. *Fonville* (1973) 35 Cal.App.3d 693, 707 [111 Cal.Rptr. 53] (defendant's conversation with his uncle in police interview room); *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 15 [147 Cal.Rptr. 208] (defendant's jailroom conversation with his brother and sister); *People* v. *Estrada* (1979) 93 Cal.App.3d 76, 99 [155 Cal.Rptr. 731] (defendant's conversation with his sister in jail visiting room); *People* v. *Owens* (1980) 112 Cal.App.3d 441, 448-449 [169 Cal.Rptr. 359] (codefendants in jail interview room); *People* v. *Dominguez* (1981) 121 Cal.App.3d 481, 505 [175 Cal.Rptr. 445] (codefendant and his mother in jail visiting room).) Even marital communications were held admissible absent unusual circumstances demonstrating a deliberate attempt to create an expectation of privacy. (*People* v. *Hill* (1974) 12 Cal.3d 731, 765 [117 Cal.Rptr. 393, 528 P.2d 1] (conversation in jail visiting room);* cf. *People* v. *Rodriguez* (1981) 117 Cal.App.3d 706, 713-715 [173 Cal.Rptr. 82] (letter from inmate husband to inmate wife). In fact, apart from *North,* we have uncovered no pre-*De Lancie* case from any jurisdiction suppressing a jail or police station conversation on Fourth Amendment or equivalent state grounds.

Defendant nevertheless argues that his motion to suppress should be granted under pre-*De Lancie* law. He cannot predicate his claim on the family relationship, for communications between brothers are not privileged under the Evidence Code. And under the post-*North* cases, merely leaving the communicants alone in a room was not considered an improper attempt to create an expectation of privacy. (*People* v. *Finchum, supra,* 33 Cal.App.3d 787, 791; *In re Joseph A., supra,* 30 Cal.App.3d 880, 885-886.) He therefore stresses the unique aspect of his case: the fact that neither he nor his brother was under arrest at the time of their conversation.

In upholding the admission of intercepted conversations, the pre-*De Lancie* California cases do not clearly distinguish whether the crucial factor is

---

*Overruled on other grounds in *People* v. *De Vaughn* (1977) 18 Cal.3d 889, 896, footnote 5 [135 Cal.Rptr. 786, 558 P.2d 872].

the status of the speakers—at least one being an inmate or detainee—or the location of the conversation in a jail or police station. Federal cases involving searches antedating *Katz* v. *United States, supra,* 389 U.S. 347, had emphasized the place of the conversation (see *Lanza* v. *New York, supra,* 370 U.S. 139, 143-144 [8 L.Ed.2d 384, 387-388]; *Christman* v. *Skinner, supra,* 468 F.2d 723, 726; *Williams* v. *Nelson, supra,* 457 F.2d 376, 377); older California cases proclaimed instead that a prisoner has no right of privacy (see *People* v. *Lopez* (1963) 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Morgan* (1961) 197 Cal.App.2d 90, 93 [16 Cal.Rptr. 838]).[4] After *Katz,* however, all cases talked in terms of the effect of the location of the conversation or the speaker's status on whether he could reasonably and justifiably expect privacy.[5]

The fundamental premise underlying all these decisions upholding admissibility was that routine monitoring of police station and jail conversations was necessary for institutional security, and consequently that society should not recognize any expectation of privacy which would impede that activity. Prior to *De Lancie,* the fact that a particular conversation was monitored not for security purposes but to gather evidence did not argue against admissibility.[6] (See Henry, *Electronic Surveillance in California Prisons After De Lancie* v. *Superior Court* (1982) 22 Santa Clara L.Rev. 1109, 1112-1116.) The cases evince no reliance on the speaker's lack of awareness of the pervasive practice of monitoring conversations in jail or

---

[4] Until amended in 1968, Penal Code section 2600—the so-called "civil death" statute—contained language which could have been interpreted to abolish a convicted felon's right of privacy. That statute, however, never applied to detainees and other persons confined in local facilities. (*De Lancie* v. *Superior Court, supra,* 31 Cal.3d 865, 871-872.) Consequently decisions which asserted that a prisoner had no right of privacy based that statement not upon the civil death statute, or any deprivation of rights incident to conviction, but on the security needs of the institution. (See *United States* v. *Hearst, supra,* 563 F.2d 1331, 1345-1346; *North* v. *Superior Court, supra,* 8 Cal.3d 301, 308-309.)

[5] Some California cases stress the location of the conversation. *In re Joseph A., supra,* 30 Cal.App.3d 880, 886, for example, declared that "persons within a jail or police facility have no reasonable expectation of privacy as to conversations." Similar language appears in *People* v. *Dominguez, supra,* 121 Cal.App.3d 481, 505-506; *People* v. *Jardine* (1981) 116 Cal.App.3d 907, 914 [172 Cal.Rptr. 408]; and *People* v. *Martinez, supra,* 82 Cal.App.3d 1, 15. Other cases emphasize the effect of detention or arrest upon the person's expectation of privacy. (See, e.g., *People* v. *Crowson* (1983) 33 Cal.3d 623, 629 [190 Cal.Rptr. 165, 660 P.2d 389]; *People* v. *Estrada, supra,* 93 Cal.App.3d 76, 99; *People* v. *Blair* (1969) 2 Cal.App.3d 249, 256 [82 Cal.Rptr. 673].) Most cases refer to both considerations. (See, e.g., *People* v. *Owens, supra,* 112 Cal.App.3d 441, 448; *People* v. *Case* (1980) 105 Cal.App.3d 826, 835 [164 Cal.Rptr. 662].) None of the cases discuss the admissibility of an intercepted conversation in a jail or police station between persons who have not been arrested or detained.

[6] One decision, *People* v. *Owens, supra,* 112 Cal.App.3d 441, held that even apart from security needs the public interest in detecting a suspect's fabrication justified monitoring his conversation.

in the police station,[7] and thus undertake no real attempt to assess the reasonableness of his expectation of privacy. Instead they state a legal fiction: that no one can reasonably expect privacy in a jail or police station unless the conversation is protected by an evidentiary privilege.

The foregoing review of pre-*De Lancie* California cases does not support the present defendant's claim that police interception of the conversation between him and his brother violated their right of privacy under then-existing California law. It is true that many cases spoke of persons in custody lacking a "right" of privacy, but the underlying rationale of that language was that monitoring conversations by such persons is essential to institutional security. That rationale applied equally to all persons admitted to and left alone in an interview or other interior room of the police station, whether or not they have been arrested. Thus, under pre-*De Lancie* California law, the Donaldsons' expectation of privacy would be unreasonable as a matter of law.

4. *The effect and retroactivity of De Lancie.*

Defendant contends that our *De Lancie* decision recognized that a person in jail or a police station may have a reasonable expectation of privacy and, to protect such expectations, limited police monitoring to that necessary to protect institutional security. He claims that under this standard, the police recording of the conversation with his brother was unlawful. Finally, defendant maintains that such evidence, obtained in violation of *De Lancie*, should be suppressed even though the recording was made before *De Lancie* was rendered.

In reviewing defendant's arguments, we first consider the effect of *De Lancie* upon prior California law. Then, avoiding any decision as to whether *De Lancie* requires the exclusion of evidence obtained after that case was filed, we turn directly to the question of retroactivity. Our conclusion that *De Lancie* does not apply to antecedent searches is dispositive of this case.

*De Lancie* itself was a civil action for injunctive relief, prompted by disclosures at the Patty Hearst trial (see *United States* v. *Hearst, supra,* 563 F.2d 1331) revealing that personnel at the San Mateo County jail were routinely monitoring conversations between visitors and pretrial detainees. We held that allegations charging that such monitoring was conducted for purposes other than institutional security stated a cause of action. (*De Lan-*

---

[7]If, however, the speaker is aware or suspects police monitoring, that fact is cited as an additional reason for rejecting his privacy claim. (See *People* v. *Estrada, supra,* 93 Cal.App.3d 76, 99; *People* v. *Blair, supra,* 2 Cal.App.3d 249, 256.)

*cie* v. *Superior Court, supra,* 31 Cal.3d 865, 877.) That holding necessarily implied that secret monitoring of conversations between detainees and visitors, "undertaken for the purpose of gathering evidence for use in criminal proceedings, rather than to maintain the security of the jail" (*id.*), was unlawful.

The *De Lancie* decision relied largely on Penal Code sections 2600 and 2601, which restored certain civil rights to prisoners, including the right "to have personal visits [subject to] such restrictions as are necessary for the reasonable security of the institution." (§ 2601.)[8] Principles of equal protection, we explained, required that pretrial detainees receive the same rights as those accorded by statute to prisoners. (31 Cal.3d at p. 872.)

Since Donaldson and his brother were neither prisoners nor detainees, and had never been deprived of any civil rights, *De Lancie*'s statutory analysis is largely irrelevant to the present case. What is crucial is *De Lancie*'s discussion of *North* v. *Superior Court, supra,* 8 Cal.3d 301. Defendants in *De Lancie* relied on *North* for the proposition that ordinarily there can be no reasonable expectation of privacy in a jail or police station, and asserted that consequently routine monitoring of detainee-visitor conversations violated no expectation of privacy. Our rejection of that proposition was essential to the *De Lancie* decision.

Three considerations led us to reject the reasoning of *North*. First was the obvious need of persons confined in jail to communicate in private with their spouses, families, and friends about matters often of a confidential or intimate nature. Permitting state officials to listen in on such conversations for reasons unrelated to jail security—indeed without any reason at all—offends the fundamental right of privacy guaranteed by the California Constitution. (Cal. Const., art. I, § 1.)

Second, sections 2600 and 2601 enacted a policy of restoring to inmates those civil rights compatible with prison security. The purpose of that policy would be defeated if we were to hold that no one within a jail or police station—inmate or not—has any right or expectation of privacy. (See 31 Cal.3d at pp. 875-876.)

---

[8]Sections 2600 and 2601 read in part as follows:

Section 2600: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."

Section 2601: "Notwithstanding any other provision of law, each such person shall have the following civil rights: . . .

"(d) To have personal visits; provided that the department may provide such restrictions as are necessary for the reasonable security of the institution. . . ."

Finally, we observe that *North* and similar cases did not purport to make a factual determination that inmates do not subjectively expect privacy, or that such expectations are unreasonable, but simply declared a legal proposition, the absence of any right of privacy in jail. (P. 875.) As a realistic matter, persons placed in a setting where they could be overheard only through the use of hidden microphones or tapped telephone wires often do expect privacy. And unless those persons actually know of police monitoring practices or of court decisions authorizing those practices, we could not describe their expectation as unreasonable. Indeed from the cases which have come to our attention, it appears that an expectation of privacy in a police station or jail whenever the conversation cannot be overheard by unaided ears is so commonly entertained that the police anticipate and routinely exploit it to obtain evidence of crimes.

In short, *De Lancie* held that the "no expectation of privacy in a police station or jail" doctrine of *North* v. *Superior Court* could not be justified either as a measure of the conversant's subjective belief or as a judgment on the reasonableness of that belief. The monitoring of conversations could be upheld only when supported by an overriding state interest of sufficient magnitude to justify invading the privacy of the persons monitored. Drawing upon Penal Code section 2601, we approved monitoring to safeguard "the reasonable security of the institution," but held that allegations charging the county with routinely monitoring detainee-visitor conversations for the sole purpose of gathering evidence stated a cause of action.

In the present case, the testimony suggests that the police secretly recorded the Donaldson brothers' conversations to acquire leads or evidence about the murder, not to protect the security of the police station. The district attorney here does not claim the monitoring complies with the *De Lancie* decision. He argues instead that *De Lancie,* a civil action for injunctive relief, should not be extended to require the suppression of evidence in a criminal proceeding, and that in any event it should not apply to police conduct that took place before *De Lancie* was rendered. As we mentioned earlier, we decide this case on the second ground, holding that *De Lancie* does not affect the validity of antecedent searches, and avoid any determination of the effect of *De Lancie* upon police monitoring after that decision was filed.

■ In determining whether a decision should be given retroactive effect, the California courts undertake first a threshold inquiry, inquiring whether the decision established new standards or a new rule of law. If it does not establish a new rule or standards, but only elucidates and enforces prior law, no question of retroactivity arises. (See *United States* v. *Bowen* (9th Cir. 1974) 500 F.2d 960, 975; *People* v. *Jones* (1980) 108 Cal.App.3d 9,

16 [166 Cal.Rptr. 131] and cases there cited.) Neither is there any issue of retroactivity when we resolve a conflict between lower court decisions, or address an issue not previously presented to the courts. In all such cases the ordinary assumption of retrospective operation (*County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680-681 [312 P.2d 680]; *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 953-954 [148 Cal.Rptr. 379, 582 P.2d 970]) takes full effect. Thus, we must undertake a threshold inquiry to determine whether *De Lancie* established a "new" rule or standard which could be given nonretroactive application.

The United States Supreme Court has recently attempted to define the decisions involving a "clear break with the past" (*Desist* v. *United States* (1964) 394 U.S. 244, 248 [22 L.Ed.2d 248, 254, 89 S.Ct. 1030]) that raise an issue of retroactivity. According to *United States* v. *Johnson* (1982) 457 U.S. 537 [73 L.Ed.2d 202, 102 S.Ct. 2579], "[s]uch a break has been recognized only when a decision explicitly overrules a past precedent of this Court [citations], or disapproves a practice this Court has arguably sanctioned in prior cases [citations], or overturns a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved." (457 U.S. 537 at p. 551 [73 L.Ed.2d at p. 215, 102 S.Ct. at p. 2588].)

While *De Lancie* did not expressly overrule any prior decision, it disapproved a practice arguably sanctioned by *North* v. *Superior Court, supra,* 8 Cal.3d 301, and many other decisions. Although based in part on an interpretation of two 1975 statutes, Penal Code sections 2600 and 2601, *De Lancie* was clearly not a simple application of the statutory language. Prior cases had held that at least as to nonprivileged conversations there existed no right of privacy in a jail or police station, and if that doctrine prevailed, mere application of the language of sections 2600 and 2601 would offer no protection. Thus, in its departure from past precedent, even though in the context of statutory interpretation, *De Lancie* appears to represent the type of break from prior law which may justify nonretroactivity under *United States* v. *Johnson.*[9]

---

[9]We faced a similar issue in *People* v. *Bustamante, supra,* 30 Cal.3d 88, when we considered whether our holding establishing the right to counsel at preindictment lineups should be applied retroactively. Our only prior decision on the right of counsel in this setting, *People* v. *Chojnacky* (1973) 8 Cal.3d 759 [106 Cal.Rptr. 106, 505 P.2d 530], was decided by a plurality opinion; thus, in upholding the right we did not need to overrule *Chojnacky* or any other case. The defendant in *Bustamante* seized on this fact to argue in favor of retroactive application. We rejected his argument in the following language:

"In recent years, when we have overruled decisions on criminal procedure upon which prosecutors and lower courts have relied, we have often declared that our holding is prospective except as to the individual defendant whose appeal is being adjudicated by the court (see *People* v. *Cook* (1978) 22 Cal.3d 67, 99, fn. 18 [148 Cal.Rptr. 605, 583 P.2d 130] and cases there cited). As the public defender points out, we have hitherto applied that doctrine only when we have overruled an earlier decision of this court. In the present case,

Once resolved that a decision establishes a new standard, the California courts define the retroactive effect of that decision under the tripartite test based upon *Stovall* v. *Denno, supra,* 388 U.S. 293. ■ *People* v. *Kaanehe* (1977) 19 Cal.3d 1 [136 Cal.Rptr. 409, 559 P.2d 1028], explains the California practice: "Whether a judicial decision establishing new . . . standards is to be given retroactive effect is customarily determined by weighing the following factors: '(a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of retroactive application of the new standards.' (*Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203]; accord, *In re Johnson* (1970) 3 Cal.3d 404, 410 [90 Cal.Rptr. 569, 475 P.2d 841].) 'It is also clear that the factors of reliance and burden on the administration of justice are of significant relevance only when the question of retroactivity is a close one after the purpose of the new rule is considered.' (*In re Johnson, supra,* 3 Cal.3d 404, 410.) Decisions have generally been made fully retroactive only where the right vindicated is one which is essential to the integrity of the fact-finding process. On the other hand, retroactivity is not customarily required when the interest to be vindicated is one which is merely collateral to a fair determination of guilt or innocence. [Citation.]" (19 Cal.3d at p. 10; accord, *In re Joe R.* (1980) 27 Cal.3d 496, 511 [165 Cal.Rptr. 837, 612 P.2d 927].)[10]

■ In search and seizure cases, the tripartite test leads generally to the conclusion that a decision should not be given retroactive effect.[11] As ex-

our decision upholding a right to counsel at preindictment lineups does not conflict with any prior precedent of this court. Nevertheless, because the *Chojnacky* court failed to reach a majority, the Courts of Appeal were compelled to decide that issue without guidance from this court; they decided against extending the right to counsel to preindictment lineups; police, prosecutors, and courts have placed extensive reliance upon these decisions. We believe that the rationale underlying prospectivity in *Cook* and similar cases applies in the present situation. Accordingly, with the exception of the present appeal, the holding in this opinion should apply only to lineups held after the date of finality of this opinion." (30 Cal.3d at p. 102.)

[10]Recent California cases which hold a decision prospective under this test have nevertheless granted relief to the individual litigant whose appeal is being adjudicated. (See *People* v. *Bustamante, supra,* 30 Cal.3d 88, 102; *People* v. *Cook* (1978) 22 Cal.3d 67, 99, fn. 18 [148 Cal.Rptr. 605, 583 P.2d 130] and cases there cited.) Since *De Lancie* was a civil case seeking injunctive (i.e., prospective) relief only, we had no occasion to consider questions of retroactivity in that decision even as to the litigants themselves.

The Supreme Court decision in *United States* v. *Johnson, supra,* 457 U.S. 537 [73 L.Ed.2d 202, 102 S.Ct. 2579], criticized the tripartite test of *Stovall* v. *Denno, supra,* 388 U.S. 293, especially the practice of granting retroactive relief to only the defendant in lead case, a practice it viewed as a denial of equal justice to other defendants whose appeals were not yet final. Yet the court limited that criticism to a context of a case which did not represent a clear break from prior precedent—a case, in other words, in which we would not ordinarily apply the *Stovall* v. *Denno* test. It is unclear at this time how the United States Supreme Court would determine an issue of retroactivity in a case which does constitute a clear break from past decisions.

[11]On the other hand, the test leads to retroactive application of decisions which "implicate

plained in *Kaanehe*, in such a case "[e]xclusion is not necessary to ensure the reliability of the fact-finding process at trial. No compulsion is present and the evidence seized is entirely trustworthy. As the purpose of the exclusionary rule in those circumstances is to deter illegal conduct by law enforcement officials, exclusion of evidence seized prior to the pronouncement of a decision does not further compliance with that decision." (19 Cal.3d 1, 10-11; accord, *In re Joe R., supra,* 27 Cal.3d 496, 511-512; see *People* v. *Cook, supra,* 22 Cal.3d 67, 99, fn. 18; *People* v. *Ramey, supra,* 16 Cal.3d 263, 276, fn. 7; *People* v. *Superior Court (Harris)* (1979) 100 Cal.App.3d 386, 389 [160 Cal.Rptr. 880].)

▮ Consequently, even if we were to require the suppression of evidence seized in violation of the *De Lancie* standards, we would not apply that rule to evidence derived from pre-*De Lancie* searches. The purpose of the *De Lancie* decision was to limit clandestine police monitoring in order to protect the private communications of inmates, detainees and visitors. Whether or not an exclusionary sanction is necessary to achieve that purpose, retroactive application of such a sanction would serve no constructive purpose; it would not restore the privacy of those whose innocent conversations had been monitored, but would benefit only those who made incriminating admissions. Neither would it add to the deterrent effect of the *De Lancie* decision upon future monitoring. Therefore, in view of the reliance of the police upon pre-*De Lancie* searches, we conclude that *De Lancie* does not require the exclusion of evidence obtained in antecedent searches.

Defendant having failed to show an adequate basis for suppression of the challenged evidence under either federal or California law, the alternative writ of mandate is discharged, and the petition for a peremptory writ is denied.

Kaus, J., and Grodin, J., concurred.

**RICHARDSON, J.** ▮ Because I continue to disagree with the holding in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 879 [183 Cal.Rptr. 866, 647 P.2d 142] [dis. opn.], I concur in the majority's holding that *De Lancie* should not be applied retroactively.

**MOSK, J.,** Concurring. ▮ Since I dissented in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 881 [183 Cal.Rptr. 866, 647 P.2d 142], I agree that *De Lancie* should not be applied retroactively.

questions of guilt and innocence" (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 258 [158 Cal.Rptr. 330, 599 P.2d 636]; see *People* v. *Gainer* (1977) 19 Cal.3d 835, 853 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73]). Nonretroactivity is the rule only when that result does not risk the conviction of innocent persons.

I also renew my suggestion (*id.* at p. 882) that there is a simple solution to these recurring problems of monitoring jailhouse conversations. If signs were posted to warn inmates and visitors that their conversations are subject to being overheard and recorded, there could be no reasonable expectation of privacy. In oral argument in *De Lancie,* which involved San Mateo County, counsel conceded a general willingness to post such notices. Apparently, the word has not yet reached some other counties.

**REYNOSO, J.**—I respectfully dissent. A person does not relinquish rights by voluntarily walking into a police station. As the United States Supreme Court held in *Katz* v. *United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 582, 88 S.Ct. 507], "the Fourth Amendment protects people, not places." The right of privacy recognized in *Katz* is based on the status of the complaining party and not on the individual's physical location.

Article I, section 1 of the California Constitution gives all people of this state the express right of privacy. (*White* v. *Davis* (1975) 13 Cal.3d 757, 773 [120 Cal.Rptr. 94, 533 P.2d 222].) This right of privacy is also protected by article I, section 13 of the California Constitution and the Fourth Amendment to the United States Constitution, which together give the people of this state the right to be secure against unreasonable searches and seizures.

The majority implicitly relies on *Lanza* v. *New York* (1962) 370 U.S. 139 [8 L.Ed.2d 384, 82 S.Ct. 1218], decided before *Katz.* There, the Supreme Court held that a nondetainee could not rely on the Fourth Amendment in refusing to answer questions based on a monitored conversation with his jailed brother. A jail visiting room, the court explained, was not a protected area. However, although Lanza himself was not detained, the person with whom he spoke was. In contrast, neither speaker in the present case was legally detained. The fact that they spoke in a police station does not abrogate their constitutional rights.

For the government to infringe a person's fundamental constitutional right, such as the right of privacy (*Roe* v. *Wade* (1972) 410 U.S. 113, 152 [35 L.Ed.2d 147, 176-177, 93 S.Ct. 705]), a compelling interest must exist (*White* v. *Davis, supra,* 13 Cal.3d 757, 775). One such compelling interest is the need for reasonable institutional security. (*People* v. *Owens* (1980) 112 Cal.App.3d 441, 449 [169 Cal.Rptr. 359].)

In *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142], this court held that county jail officials may not monitor ostensibly private conversations between pretrial detainees and their visitors for the purpose of discovering evidence for use in criminal trials. The ma-

jority disposes of this case based on the nonretroactivity of *De Lancie,* since *De Lancie* was decided in 1982 while the electronic monitoring in the instant case occurred in 1980. However, I believe the retroactivity or nonretroactivity of *De Lancie* is irrelevant. *De Lancie* merely clarified existing law— that absent security purposes, the monitoring of detainees' conversations for the purpose of discovering evidence for use in criminal trials is now and always has been unlawful.[1]

While the majority states that pre-*De Lancie* California cases do not clearly articulate whether the crucial factor in intercepted conversation cases is the status of the individuals or the location of the conversation, it concedes that the cases upon which it relies do not "discuss the admissibility of an intercepted conversation in a jail or police station *between persons who have not been arrested or detained.*" (Maj. opn., *ante,* at p. 33, fn. 5; italics added.) In the case at bench, unlike the detainees in *De Lancie* and *North* v. *Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155], and the inmate in *Lanza,* neither individual electronically monitored was imprisoned or detained by the police. In fact, neither was even a suspect.

As the majority acknowledges, the monitoring was apparently for evidentiary rather than security purposes. Had the police proffered evidence that the monitoring was for security purposes, it would be for the trier-of-fact to determine whether the monitoring was reasonable under the circumstances. In the absence of such evidence, the monitoring was clearly unlawful as a matter of law.

I conclude that the monitoring of the conversation between defendant and his brother constituted an invasion of their right of privacy and resulted in an unreasonable search and seizure under both federal and California law. The evidence obtained thereby is therefore inadmissible.

Bird, C. J., concurred.

Petitioner's application for a rehearing was denied December 21, 1983. Bird, C. J., was of the opinion that the application should be granted.

---

[1]The limited scope of this permissible intrusion on the constitutional right of privacy is underscored by the 1975 amendment to Penal Code section 2600 and the enactment of Penal Code section 2601, subdivision (d). In these provisions, the Legislature established that prisoners retain the rights of free persons except to the extent that restrictions are necessary to insure the security of the prison and the protection of the public. Although these sections speak of persons confined in state prison, detainees and visitors in local jails and police stations must enjoy at least equal rights as a matter of logical and constitutional necessity.