[Crim. No. 6257. Fifth Dist. Feb. 28, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DOUGLAS DENNEY, Defendant and Appellant.

534

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Cynthia A. Thomas, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just and David De Alba, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

## FRANSON, Acting P. J.—

### Statement of the Case

Appellant stands convicted of robbery (Pen. Code, § 211) and first degree felony murder (Pen. Code, § 189) with special circumstances (Pen. Code, § 190.2, subd. (a)(17)(i)). He was sentenced to life imprisonment without possibility of parole.

We first hold that under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], it was error to sentence appellant to life imprisonment without the possibility of parole, since no evidence was introduced that appellant specifically intended to kill the victim. Although the killing occurred before the effective date of *Carlos,* we nonetheless determine that *Carlos* should be given retroactive application to the present case.

We also hold that while other evidence sufficed to support appellant's conviction of robbery and first degree felony murder, the trial court erred in admitting appellant's confession which had been obtained in flagrant violation of appellant's constitutional rights. Reversal is mandated by established law.

Finally, we advise the trial court on an evidentiary issue that may arise on retrial. (Code Civ. Proc., § 43.)

### The Facts

On November 24, 1980, appellant, Rocky Laboa, Danny Carl and Michelle Keener went to the trailer house where Juan Antonio Morones lived. They planned to have Ms. Keener commit an act of prostitution with Mr. Morones and then rob him. The men had guns to use during the robbery; appellant was carrying a Colt .357 magnum revolver.

The robbery began as planned. Ms. Keener had sex with the victim. While she was inside, a Charles Spoler drove up. He was acquainted with Danny Carl and was also pimping his wife to farm workers. Danny Carl told him to leave because they were planning to rob the man inside. Appellant, Danny Carl and Rocky Laboa then went into the trailer and ordered Mr. Morones (still naked) down the hall to the bathroom. Appellant was holding his gun in Mr. Morones' face.

As appellant and Carl were tying Morones up in the bathroom, the gun went off. Morones was killed instantly. Everyone left. Michelle took a plastic baggie of Morones' cash, later giving it to Danny Carl. Appellant and the others were upset by the shooting. Appellant reportedly wanted to call an ambulance, said the shooting was an accident and was crying.

The guns were buried in a field alongside the road, and the group returned to Hanford.

Several months later, Ms. Keener went to work in a convenience store. She became friendly with some policemen. Eventually she told them about the shooting and was given immunity. The murder weapon was found through Keener's information. Keener testified to all of the events at trial. Spoler and his wife confirmed they were sent away by Danny Carl because of the robbery. Others, including appellant's heroin connection, testified regarding admissions made by appellant and the others after the shooting. By all accounts, the shooting was accidental.

### Police Interrogation

Appellant was first interrogated by two Kern County sheriff's deputies at the Hanford City jail. Before turning on the tape recorder, the officers told appellant they were there because of the homicide and that they knew all about it through Ms. Keener. They told appellant that Keener had been given immunity. The officers also told appellant a "hypothetical" story. They said that in another "accidental" felony/homicide, the actual triggerman cooperated and received a five-year manslaughter sentence; while those who refused to cooperate got life in prison without parole.

Appellant testified at the Penal Code section 1538.5 suppression hearing that after he heard about Keener's immunity and the hypothetical story concerning "cooperation" with the authorities, he requested an attorney but the officers talked him out of it before turning on the tape. One officer testified at the beginning of the suppression hearing that he "did not recall" appellant asking for an attorney, but neither officer rebutted appellant's testimony that he did request an attorney. The only officer who testified confirmed the "hypothetical" story was told.

Appellant's defense was diminished capacity. He testified, and counsel argued, that his use of heroin and alcohol on the day of the crime deprived him of the capacity to form the specific intent to rob the victim. In rebuttal, an undercover narcotics agent was used as an expert witness. He opined that appellant could not have drunk as much alcohol as he claimed after using as much heroin as he claimed, without vomiting. Matlock also inspected appellant's arms and opined that appellant was not a "heavy" heroin user.

The jury was not required to make a specific finding that appellant intended to kill the victim. Appellant's counsel moved to strike the "special circumstances" allegation, partly because of this gap in the instructions, but this motion was denied. There was no evidence that appellant intended to kill, so the absence of an instruction on intent obviously affected the verdict.

### Retroactivity of Carlos v. Superior Court

■ The California Supreme Court has recently held that there must be a specific finding of intent to kill to support a conviction of felony-murder special circumstances under Penal Code section 190.2, subdivision (a)(17). (*Carlos* v. *Superior Court, supra,* 35 Cal.3d 131.)

Appellant's conviction was based on this Penal Code section, but his trial was held before the decision in *Carlos* was handed down. We must, therefore, decide whether the rule in *Carlos* should be applied retroactively. This question was explicitly reserved by the Supreme Court in *Carlos. (Id.,* at p. 154, fn. 21.)

Section 190.2, subdivision (a)(17) of the Penal Code was passed as part of the death penalty initiative (the Briggs Amendment) in 1978. It requires, upon conviction, the imposition of the death penalty or a life sentence without possibility of parole. In *Carlos,* the Supreme Court found this section ambiguous and uncertain about the necessity for a finding of intent to kill in felony murder situations. (*Id.,* at p. 142.) The court resolved the ambiguities in favor of defendants and construed the section to avoid serious constitutional questions, i.e., if the section did not require intent, it might violate the cruel and unusual punishment and equal protection clauses. (*Id.,* at p. 151.) The court found that elimination of the intent requirement was not a purpose of the ballot initiative. (*Id.,* at p. 145.) The court construed the word "intentionally" in subdivision (b) of section 190.2 to require an intent to kill before a defendant is subject to a special circumstances finding under paragraph (17) of that section. (*Id.,* at pp. 153-154.)

■ In *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110], the Supreme Court held that, "In determining whether a decision should be given retroactive effect, the California courts undertake first a threshold inquiry, inquiring whether the decision established new standards or a new rule of law. If it does not establish a new rule or standards, but only elucidates and enforces prior law, no question of retroactivity arises. [Citations.]" (*Id.,* at p. 36.) The court also explained there is no issue of retroactivity when it resolves a conflict between lower court decisions or addresses an issue not previously presented to the courts. "In all such cases the ordinary assumption of retrospective operation [citations] takes full effect." (*Id.,* at p. 37.) ■ Thus, in deciding whether *Carlos* v. *Superior Court* applies to this case, we must determine whether *Carlos* established a "new" rule or standard which might not apply retrospectively.

The United States Supreme Court has attempted to define the decisions involving a "clear break from the past" (see for example, *Desist* v. *United States* (1969) 394 U.S. 244, 248 [22 L.Ed.2d 248, 254, 89 S.Ct. 1030]) that raise an issue of retroactivity. In *United States* v. *Johnson* (1982) 457 U.S. 537 [73 L.Ed.2d 202, 102 S.Ct. 2579], the Supreme Court explained that, "Such a break has been recognized only when a decision explicitly overrules a past precedent of this Court [citations], or disapproves a practice this Court has arguably sanctioned in prior cases [citations], or overturns a long-standing and widespread practice to which this Court has not spoken, but which a near unanimous body of lower court authority has expressly approved." (*Id.*, at p. 551 [73 L.Ed.2d at p. 215])

Applying the foregoing principles, it is clear that no new rule of law was created by the *Carlos* decision, nor did it represent "a clear break from the past" under the test applied in *Desist* v. *United States, supra,* 394 U.S. 244.

The *Carlos* decision construed the felony-murder provisions of the 1978 initiative. The Supreme Court merely applied established principles of statutory interpretation, made findings regarding the intent of the drafters of the initiative and concluded that an intent to kill or aid in a killing is required under this statute. *Carlos* was the first time the Supreme Court has decided this issue. Thus, no past precedent was overruled.

Nor does the *Carlos* decision disapprove a practice that the Supreme Court has arguably sanctioned. Although the statute was added by initiative in 1978, the Supreme Court had never reached this issue in earlier decisions. Thus, the court had not sanctioned felony-murder special circumstance convictions without instructing on intent to kill. So under *Desist, Carlos* is not a "clear break from the past" nor a new rule of law. As a result, under *Donaldson* v. *Superior Court, supra,* 35 Cal.3d 24, there is no remaining question of retroactivity, and the normal presumption of retrospective application governs.

■ No evidence of intent to kill was presented here, and the great weight of the testimony militates against such a finding. Consequently, we need not decide what standard of prejudice applies. Even the standard of *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] would be easily satisfied by this record.

### *Appellant's Request for an Attorney*

Appellant was first interrogated at the Hanford City jail by Sergeant Pensinger and Sergeant Johnson of the Kern County Sheriff's Office. A tape recorder was placed on the table in front of appellant, but it was not activated for at least 15 minutes while the officers talked with appellant. The

officers told appellant they knew all about the robbery and murder and that Ms. Keener had been given immunity. Then Sergeant Pensinger told appellant the hypothetical story. Appellant testified that after he heard the hypothetical, but before the tape recorder was turned on, he told the officers, "I want to cooperate all I can, but I would like to have a lawyer here with me when I [do]." According to appellant, one of the officers then replied, "If you demand a lawyer we will walk out right now and you will have just lost your chance to help yourself." The officer continued, "Believe me Mike, we are trying to help you. We are not trying to give you the gas chamber. *We want to keep you from getting the gas chamber.*" (Italics added.)

Although Officer Johnson had testified earlier at the suppression hearing that he did not remember appellant making any request for an attorney, neither Officer Johnson nor Officer Pensinger rebutted appellant's testimony that he asked for an attorney. Furthermore, neither officer rebutted appellant's testimony that they talked appellant out of his request for an attorney or that they threatened to walk out and deprive appellant of his chance to help himself. Finally, the officers were never asked to rebut appellant's testimony that they assured appellant they were only trying to keep him out of the gas chamber.

A party's failure to call an available witness to rebut evidence presented against the party raises the logical inference that if the witness had been called his testimony would have been adverse to the party who fails to call him. (Evid. Code, § 413; Witkin, Cal. Evidence (2d ed. 1966) § 1128, pp. 1043-1045.) Sergeant Pensinger was not called as a witness, and Officer Johnson was not asked relevant questions. We therefore draw the inference that if the officers had been called, they would have acknowledged appellant was telling the truth about his request for an attorney and that they talked him out of having an attorney.[1]

---

[1]Furthermore, appellant's testimony that he requested an attorney was not contradicted. Officer Johnson's testimony that he "did not recall" such a request does not contradict appellant's testimony. As explained in *People* v. *Jimenez* (1978) 21 Cal.3d 595 at page 612 [147 Cal.Rptr. 172, 580 P.2d 672], "a witness' testimony that he does not recall making a statement represents only a present failure to recollect, and therefore does not constitute a contradiction of a prior statement." Officer Johnson's testimony is not even inconsistent with appellant's testimony. (*People* v. *Sam* (1969) 71 Cal.2d 194, 208-210 [77 Cal.Rptr. 804, 454 P.2d 700].) At best, the "I do not recall" statement is equivocal. Since it was the prosecution's burden to prove the advisement and waiver of appellant's right to an attorney and the voluntariness of the confession beyond a reasonable doubt (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 608) and since the prosecution could have questioned the officers precisely in rebuttal on the attorney request question, appellant's testimony was essentially "undisputed." This being so, " ' " "As a reviewing court it is our duty to examine the uncontradicted facts to determine *independently* whether the trial court's conclusion of voluntariness was properly found. . . ." ' " (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 609, italics added.)

In *Miranda* v. *Arizona* (1966) 384 U.S. 436 at pages 473-474 [16 L.Ed.2d 694, 723, 86 S.Ct. 1602, 10 A.L.R.3d 974], the Supreme Court states: ▮ "If the individual indicates *in any manner, at any time* prior to or during questioning, that he wishes to remain silent, the interrogation *must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.* ▮ Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been *once invoked.*" (Italics added, fn. omitted. See also *People* v. *Ireland* (1969) 70 Cal.2d 522, 535-537 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Randall* (1970) 1 Cal.3d 948, 954-955 [83 Cal.Rptr. 658, 464 P.2d 114].)

▮ When appellant said he wanted an attorney, the interrogation should have stopped. But these officers kept the interrogation going by talking to appellant. They threatened him with the loss of his last chance "to help [him]self." They said, "Believe me Mike, we are trying to help you. . . . We want to keep you from getting the gas chamber." This blatant violation of the *Miranda* rules compels a finding that everything said by appellant from this point on was the product of the officers' threats.

Respondent argues that appellant's later *taped* waiver of his *Miranda* rights, including the right to an attorney, cures the violation. This waiver immediately followed the off-the-tape conversation described above. Respondent's argument ignores the absolute requirement that the police must "entirely terminate custodial interrogation upon invocation of the Fifth Amendment privilege . . . ." This rule is "one of the primary 'protective devices' fashioned by *Miranda.*" (*People* v. *Randall, supra,* 1 Cal.3d 948 at p. 954.)

Appellant's failure to insist on the presence of an attorney was obviously compelled by the officers' threats to withhold their help and let him get the gas chamber, together with their use of the "hypothetical" to suggest that he could get a reduced punishment by cooperating. Although this story does not amount to a direct promise of leniency, it was told for an obvious purpose—to induce appellant's confession. As a result, appellant did not insist on the presence of an attorney and made the taped *Miranda* waiver and denied that the officers had promised leniency.

### The "Hypothetical" as an Offer of Leniency

Officer Pensinger told appellant a story before turning on the tape recorder and advising him of his *Miranda* rights. The story is a fictionalized version

of a story that is quite familiar to this court, having given rise to a series of appeals in *People* v. *Willbanks* (1983) (5 Crim. No. F000693), *People* v. *Beheler* (1982) (5 Crim. No. F000633) and *People* v. *Howard* (1982) (5 Crim. No. 5181).[2] Appellant testified:

"Q. Upon your first contact in the room with Sgt. Pensinger can you indicate what was the first thing he told you? How did the contact open up, verbally?

"A. Well, he said he was here investigating the murder of a farm worker, Juan Morones, and he was carrying four folders. He placed the four folders right down in front of me and he asked if I knew these people and he read the names. Rocky Laboa, Michelle Keener, Danny Carl. And I said, 'Yes, I know them.' He said, well, we were all of us being investigated for a homicide out of Kern County. Then he stopped for a few seconds.

"Q. 'He', would you refer to the person when you say he?

"A. Sgt. Pensinger paused for a few moments and said, 'Before we go any further I want to tell you a hypothetical situation or story that is actually true.'

"Q. Can I pause for a moment? To the best of your recollection I want you to use the words that Officer Pensinger used in giving you this hypothetical to the best of your recollection.

"A. I will try. He said, 'This is a hypothetical situation but it is actually true. It actually happened and it is very similar to your case. *You will understand why after I am through telling you.*' He said that there was four people driving around, they were all getting loaded and drinking and just like you were, and he said there was also a girl who was selling drugs at a liquor store and one of them or all of them knew it. One of them suggested they go over and rob her and take her money.

"So they drove over there and the guy that was riding in the car pointed a gun at the girl. The guy in the passenger side got out, to help take the money from her. While he was walking up to her the gun had gone off in his hand and he thought, 'Oh, my God, the gun went off,' and so they all got in the car, I don't know if he said they took money or not, but they all got back in the car and they left. He *said the two that were in the back seat got life without possibility of parole. They didn't cooperate.*

---

[2] In the actual case, *those who cooperated* received life without parole from the trial court, but the actual triggerman, using diminished capacity, was convicted by a jury of only manslaughter. Officer Pensinger thus twisted the story to get the desired effect.

"Q. Is that the words that Sgt. Pensinger used?

"A. Yes.

"Q. That they didn't cooperate?

"A. That they did not cooperate. *He said that the guy that was driving the car confessed, made a full confession, and the jury was able to hear his confession and to know it was an accident because it was an accident and he only got five years in prison. The guy that was on the passenger side never went to jail, never was booked. He also cooperated with us.*

"Q. Okay. Now, as a result of that hypothetical being told to you, what effect did it have on you mentally in respect to the interview?

"A. *Mentally,* it made me—it is hard to answer—*it made me want to cooperate as much as I can.*

"Q. As a result of that hypothetical being told to you *did you have some feeling that if you cooperated you would get a lesser sentence?*

"A. *Yes, I had a definite feeling that I would.*

"Q. What produced that feeling in your mind?

"A. Well, the drugs that I had consumed that day and the story that he told me.

"Q. You are referring to the hypothetical?

"A. The hypothetical story." (Italics added.)

Officer Johnson confirmed that this story was told. Again, Officer Pensinger, who told the story to appellant, was not called by the prosecution to rebut appellant's testimony even though Pensinger was present at the hearing.

The "hypothetical" clearly suggested to appellant that if he "cooperated" with the officers, i.e., confessed his involvement in the robbery and murder, appellant would have a chance of getting five years in prison for manslaughter. This, of course, was blatantly false since at the time even an accidental killing in the course of a robbery was considered first degree felony murder. The officers also must have known the actual outcome of the story was contrary to what they told appellant.

Again, respondent relies on the taped express waiver of appellant's *Miranda* rights and appellant's taped statement that the officers made no promises to him concerning punishment and no threats to induce his confession. Apparently, considering only the taped statement, the trial court concluded there was "not the slightest suggestion of leniency." This argument and the trial court's ruling totally ignore what happened before the tape was turned on. As noted above, the cooperation demanded by the officers *included* the taped waivers and deprives them of validity.

██ A criminal defendant is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession and even though there is ample evidence aside from the confession to support the conviction. (*Jackson v. Denno* (1964) 378 U.S. 368, 376 [12 L.Ed.2d 908, 915, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; *United States v. Tingle* (9th Cir. 1981) 658 F.2d 1332.)

██ To be voluntary, a confession must be the product of a rational intellect and a free will. Consequently, a confession must not be extracted by *any sort of threat* or violence, nor obtained by any direct or implied promises, however slight, *nor by the exertion of any improper influence.* (*Id.*, at p. 1335.)

A confession coerced by psychological pressure is involuntary. Law enforcement conduct which renders a confession involuntary does not consist only of expressed threats so direct as to bludgeon the defendant into failure of the will. *Subtle psychological coercion suffices as well, and at times more effectively, to overbear a rational intellect and a free will. (Ibid.)*

The relevant principles regarding implied promises of leniency or benefits have been summarized in *People v. Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]: ██ "The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" *unaccompanied by either a threat or a promise,* does not render a subsequent confession involuntary.' [Citation.] . . .

"When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in

addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (Citations omitted, italics added; see also *People* v. *Flores* (1983) 144 Cal.App.3d 459, 468 [192 Cal.Rptr. 772].)

Furthermore, the accused's statement must be entirely self-motivated: "If the pressure or inducement was 'a motivating cause' of the decision to confess, the confession is involuntary and inadmissible as a matter of law." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 328 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Flores, supra,* 144 Cal.App.3d 459, 470.) It is immaterial whether the pressure or inducement is express or implied. (*People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Thompson, supra,* 27 Cal.3d at p. 328.)

▉ Unless we totally ignore appellant's testimony about what the officers said to him before the taped interrogation began, it is clear that appellant was induced to confess by the officer's hypothetical story and pressured by the implied threat that he would get the gas chamber if he did not confess. The hypothetical about a triggerman in an accidental felony murder getting five years in prison was an extremely heavyhanded suggestion of leniency that clearly motivated appellant's decision to confess.

Respondent concedes that appellant was a "bright" person, hence, appellant could not have missed the implied threat and promise of leniency made by the officers. In this context, appellant's formalized avowal on tape that the officers made no promises concerning sentencing or punishment and that "you don't have any control [over the charges to be filed]" was simply part of the "cooperation" that was demanded by the officers.[3]

---

[3]Appellant's confusion on this point is evident in the portion of the taped interrogation quoted by respondent:

"Q. Did we make any promises concerning sentencing or what type of, of, uh, punishment you might receive?

"A. No.

"Q. Did we advise you that we had nothing and no control over that whatsoever?

"A. *No.*

"Q. OK, I'm, I thought that was clear. We have no control over what your punishment or, or what type of charge the District Attorney wishes to, may wish to file on you.

"A. *Yeah . . . no, no.*

"Q. OK . . .

"A. You don't have any control.

"Q. You understand that?

Even accepting at face value appellant's statements that the officers did not promise leniency of any sort to him or made any threats to him, the clear suggestion by the hypothetical and the officers' threats to appellant when he requested an attorney was that the *criminal justice system,* i.e., the prosecution or the courts, would reward appellant for his cooperation. Appellant's testimony as to why he confessed rings true: after being told that Keener had received immunity and after hearing the "hypothetical," appellant stated:

"A. I honestly felt that I wouldn't be charged with murder in the first degree. I felt that Sgt. Pensinger would talk to the D.A. and explain to him how cooperative I was and that it would help me in fact to maybe get a manslaughter.

"Q. Did the fact that this hypothetical been told to you by Officer Pensinger influence your thinking as to whether you would confess to the crime or not?

"A. A great deal.

"Q. Did you feel that by confessing and cooperating, like in the hypothetical, you would get a better deal or get consideration or a lesser sentence?

"A. Yes.

"Q. Just as in the hypothetical?

"A. Yes."

In *People* v. *Flores, supra,* 144 Cal.App.3d 459, a police officer made several implied promises of leniency to a defendant in the course of convincing him to admit his involvement in a murder. Everything was taped. The officers told the defendant, " 'this is a serious situation. Right now the way it looks, it looks like robbery and murder. You know what robbery and murder is? Robbery and murder is a capital offense in California. An offense that you could, you could get the, you know, *you could go to the, to the gas chamber or the electric chair whatever.' "* (*Id.,* at p. 465, italics original.) The officers then suggested a possibility that the defendant had

---

"A. Yes, I understand that.
"Q. Did we tell you that before?
"A. Yes, you told us that, that before.
"Q. OK. *Calm down, MIKE* . . . ." (Italics added.)

acted in self-defense and that "there were two sides to every story and that appellant was the only person who could help himself." *After the defendant made several incriminating statements, the officers then* "perfected" the record by having the defendant state that everything he had told the officers "'ha[d] been free and voluntary,'" and that no promises had been made; everything would be up to the judge. (*Id.,* at p. 466.) This court concluded that under all of the circumstances, appellant's incriminating admissions were not the product of a free intellect and rational choice. The officers carried on a course of conduct designed to break down appellant's will. (*Id.,* at p. 469.) Although the combined threats and promises were *only implied,* they were the motivating and inducing cause of appellant's statements. Once the cat was out of the bag, even statements from the defendant's mouth that no promises or inducements had triggered the admissions did not save the case. This is the very situation in the present case: in effect, appellant was told that cooperating by confessing might reduce his penalty to five years in prison on a voluntary manslaughter conviction. But, if he did not cooperate he possibly could get death or life imprisonment without the possibility of parole. Any reasonable person in appellant's shoes would have stood on his head or jumped through whatever hoops the officers held out in front of him to obtain the chance of lenient treatment suggested by the officers.

In sum, when we consider the substance of the hypothetical and appellant's request for an attorney, together with the officers' threats to walk out if he persisted in asking for an attorney and that appellant might get the death penalty, we must conclude that appellant's confession was involuntarily obtained by the misconduct of the police officers.

### Officer Matlock's Opinion

■ For retrial guidance, we express our opinion concerning the use of Officer Matlock as an expert witness. Officer Matlock, an undercover narcotics agent, testified that heroin users could not drink much alcohol after using heroin. He also inspected appellant's arms and opined that he was not a "heavy" heroin user. Appellant objected to his qualification as an expert, but the trial court found that his seven years' experience with narcotics abusers and one occasion where he saw a heroin user get sick after drinking brandy qualified him as an expert. Appellant contends that this finding was an abuse of discretion, that the opinion regarding "heavy use" was irrelevant and that the testimony was generally prejudicial to his diminished capacity defense.

■ The trial court has considerable latitude in deciding whether a person has sufficient knowledge, skill, experience, training or education to

qualify as an expert. (Evid. Code, § 720.) ■ On appeal, this determination will not be upset absent a manifest abuse of discretion. (*People* v. *Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240].) ■ Qualification of an expert is, however, relative to the topic of his opinion testimony. (*Ibid.*)

Police officers have been approved as experts on narcotics abuse. (See, e.g., *People* v. *Rodriquez* (1969) 274 Cal.App.2d 770, 775-776 [79 Cal.Rptr. 240]; *People* v. *Cruz* (1968) 260 Cal.App.2d 55, 58-59 [66 Cal.Rptr. 772].) In most such cases, however, the subject of the officer's testimony is the identification of narcotics abusers or typical behavioral patterns among such drug users, not on the *physiological effects* of drug use. ■ Here, Officer Matlock gave an essentially medical opinion on the effect of combining alcohol and heroin use. He supported this opinion by generalized reference to what heroin users had told him over the years and one occasion where someone he believed to have used heroin got sick after drinking brandy. The officer did not testify that he had any training in physiology or pharmacology.

On retrial, we suggest that a medical doctor be utilized by the prosecution to give a medical opinion on the physiological effect of combining alcohol and heroin use.

The judgment is reversed.

Zenovich, J., and Hamlin, J., concurred.