Filed 2/18/14  Alaimo v. Hallmark-Southwest Corp. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MADALENE ALAIMO,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HALLMARK-SOUTHWEST CORPORATION,<br><br>Defendant and Appellant. | D062571<br><br><br>(Super. Ct. No. 37-2008-00075509-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed and remanded with directions.

Smith Mitchellweiler, Mitchellweiler Law Corporation, J. Dana Mitchellweiler and Mark D. Perryman for Defendant and Appellant.

Chauvel & Descalso, Chauvel & Glatt, Michael G. Descalso and Kenneth M. Weinfield for Plaintiff and Respondent.

This case arises out of plaintiff Madalene Alaimo's purchase of a manufactured home.  Defendant Hallmark Southwest Corporation (Hallmark) is the manufacturer of the

home. In 2005 the home was purchased from a dealer named AA American Pacific Manufactured Homes, Inc. (APMH) and was thereafter delivered to Alaimo's property in the Harbison Canyon area of San Diego County. The home was installed by a contractor named Barry Sheeler.

When it was delivered, it was discovered that the home, which is manufactured in two halves, could not be properly joined at the midline. As a result, the home suffered numerous cracks in the walls and warping of the floors and exterior siding.

Alaimo notified Hallmark and APMH of the problem. Both entities sent workers to Alaimo's property in an effort to solve the problem. When the issues could not be resolved, Alaimo filed suit against Hallmark and APMH. APMH cross-complained against Sheeler. APMH and Sheeler settled with Alaimo prior to trial, paying a total of $22,000, leaving Hallmark as the sole defendant. The jury returned a verdict for Alaimo against Hallmark for $55,000. The court thereafter reduced that amount by the sum of the pretrial settlements, and judgment was entered in the amount of $33,000, plus attorney fees and expenses.

Hallmark appealed, and we reversed the judgment based upon the court's failure to give a jury instruction on the measure of damages (*Alaimo v. Hallmark-SouthWest Corp.* (Aug. 31, 2011, D056742) [nonpub. opn.]). On remand, the case was tried a second time to a jury with Hallmark again as the sole defendant.

The second trial was based on Alaimo's cause of action for breach of implied warranty. This time the jury returned a verdict for Alaimo in the amount of $12,500. The court applied a credit for the pretrial settlements, resulting in a judgment for Alaimo

2

in the net sum of $0, but found Alaimo to be the prevailing party for purposes of attorney fees and expenses.

On appeal Hallmark asserts (1) the court erred in excluding evidence of Sheeler's pretrial settlement for the purpose of showing his bias towards Hallmark, (2) the court committed error by allowing Sheeler to testify as an expert without requiring expert qualifications, and (3) there is no substantial evidence that defects existed in the home when it left Hallmark's factory. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Alaimo's Purchase of the Manufactured Home*

In February of 2005 Alaimo purchased a manufactured home from Hallmark for $87,872. The home was manufactured in two halves. Alaimo contracted with Sheeler, a contractor who specialized in the installation of manufactured homes, to install the home.

B. *Alaimo's Evidence of Defects in the Home*[1]

1. *Sheeler's testimony*

Sheeler testified, after having established his experience and expertise in installing manufactured homes for over 40 years, that the difficulties he encountered with setting up the home were not installation issues, they were manufacturing defects. He testified that he tried "all kinds of things" to try to bring the two halves of the home together.

---

[1]    Because Hallmark is challenging the sufficiency of the evidence to support the verdict, we view the entire record in the light most favorable to the judgment to determine whether it contains reasonable, credible, and solid evidence to support the trier of fact's finding. (*People v. Davis* (1995) 10 Cal.4th 463, 509.)

3

Sheeler testified that Hallmark representatives told him in the field that the home was not level. However, he demonstrated to them that the home was, in fact, level and they agreed that it was level as installed. Sheeler testified that he had installed the home so that it was perfectly level and the Hallmark representatives acknowledged that a string run across all of the I-beams under the house were touching each of the I-Beams. The home was "exactly level, perfectly level," and, according to Sheeler, that meant the problem with getting the two halves of the home to come together was not an installation problem. Sheeler testified that because the home was perfectly level, the issue was a manufacturing problem.

Sheeler testified that the Hallmark representatives suggested possible solutions that he knew would not work. The Hallmark representatives proposed putting a strap around the house and jacking it tight in order to pull the two halves together. At that point he knew the Hallmark representatives did not know what they were doing. Sheeler testified that he did everything he could to bring the two halves of the home together.

2. *John Arendsen's testimony*

John Arendsen was Alaimo's expert witness. He testified that the problem with bringing the two halves of the home together was the ridge beam. Specifically, he testified that there was a crack in the west wall of the home. The crack ran from the floor on one side of French doors, up and across the top of the French doors, and then down the other side. According to Arendsen, this was significant because it showed that these cracks were caused by tearing of the wall material. The stress was caused by the ridge beam, which is where the two halves of the home come together at the top. There are two

4

ridge beams that are connected to bring the home together and one of them was warped. Forcing these two ridge beams together, when one of them was warped, caused the stress that resulted in the cracks in the wall. Ridge beams are structural members that are installed at the factory. The warped ridge beam was visible in photographs admitted into evidence at trial. A pony wall (one that does not run all the way to the ceiling) was not level. When Arendsen measured the vertical nature of the pony wall he saw that it was not vertical; it was off-line by one inch in four vertical feet. He testified this is not acceptable in the manufactured home trade.

Arendsen measured the kitchen counter and saw that the counter was actually coming away from the wall. He also measured the level of the counter and saw that it was a half inch off in a span of four feet. This, too, was not acceptable in the manufactured home industry. Exhibit 25 is a photo of the exterior end of the home on the west side. It showed the home was not vertical and was off-line one inch in two feet and was leaning away from the other half of the home. This is consistent with the direction of the warp in the ridge beam and is not an acceptable condition in the manufactured home trade.

Arendsen testified that when the warped ridge beam was being forced together with the other ridge beam, stresses were created that resulted in the conditions that were present when he was inspecting the home. All of the problems with the home are located in one discrete area of the home—from the utility door west to the end of the home. The rest of the home seemed perfectly normal. The crowns in the floor were caused either by warped joists or stresses in the home, both of which are not acceptable in the

5

manufactured home trade. All of the things that Arendsen testified to were caused by defects in workmanship and materials, from a manufacturing standpoint. It is not normal and not acceptable to have the two halves of a home come together perfectly and then go askew in the last few feet.

Arendsen also testified that the siding on the outside of the home was warped. He referred to Exhibit 18, the top photo on the first page of that exhibit, and stated that it was the worst warp he has seen in "Hardy Board" siding that had been applied to a manufactured home. According to Arendsen, it is a violation of standards in the manufactured home industry to use warped Hardy Board siding on a manufactured home. He also referred to the third page of Exhibit 18, which consisted of two photos side by side depicting the exterior kitchen window. The condition of the siding depicted in those photos was not acceptable in the manufactured home trade. Arendsen further testified that the measurements that he made in the kitchen area were not within acceptable tolerances in the manufactured home trade.

Summing up, Arendsen stated that, in layman's terms, the home was a "lemon."

3. *Daniel Wheelan's testimony*

Daniel Wheelan, who lived with Alaimo, was at the home site every day. He took the photographs that comprised Exhibit 14. They were photos of the home when it arrived at the home site, in two halves. They were taken the day of the home's arrival on the site and also the day after it arrived. The end of the home that had the problems were depicted in photographs he took the day after the home arrived at the property. Sheeler began his work the day after the home arrived.

Exhibit 17 consisted of additional photographs taken by Wheelan. According to Wheelan a view of the kitchen counter demonstrated that the counter was crooked: "The left edge of the window was noticeably higher than the right edge of the window."

Exhibit 18 was another set of photographs taken by Wheelan beginning on the day the home arrived on the property. Wheelan testified that there was a visible bulge in the Hardy Board siding at the top of the home where the home would not come together.

According to Wheelan, Greg Kover, who replaced Sheeler as the installer, ran into exactly the same problem at exactly the same place in attempting to bring the two halves together.

Wheelan testified that there were several cracks inside the home when it was delivered. Wheelan testified that the cracks in the "A" half of the home (the half without any manufacturing defects) have not returned but that three cracks in the "B" side have continually returned. These cracks were all in the west end of the home, where all of the defects are located. Whelan testified as to the same "tear" crack that Arendsen noted up and over the French door. Wheelan first noticed the cracks in that section within a day or two after delivery of the home.

4. *Joe Russo's testimony*

Joe Russo was Hallmark's expert witness. He admitted that he had never been to the home and had never actually seen any of the conditions that were out there. While he blamed the problems on the home on Sheeler, he admitted that there might be only minimal sagging on the "B" side where the kitchen and dining room are located. As to Exhibit 18, Russo opined that the warped exterior siding would be expected to look like

7

that upon delivery, but then admitted that he did not know when one of those photographs was taken.

Russo admitted that the home was resting on a level stem wall with a solid foundation and the supporting piers were all placed correctly on wood pads on top of concrete. He admitted that he did not have any measurements of any sagging and that he was simply basing this testimony on his "experience." Finally, Russo agreed with Sheeler's testimony about the dormer on the roof of the home on the "A" half (the half without any defects). Russo testified that he would be most concerned with sagging side walls where the fireplace and the dormer are located.

While Russo testified at trial that moisture can cause otherwise acceptable floor joists to warp, he had admitted in his deposition that he would expect that less than 5 percent of the time. Russo testified the ventilation was inadequate.

5. *Donald Wood's testimony*

Donald Wood is a civil engineer called by Hallmark as an expert witness at trial. He had been out to the home and did a study of the conditions as they existed in May 2006, a year after the home had been installed on the property. Wood admitted that the floor in the kitchen was not level, the floor in the dining room was not level, and there was no problem with the foundation of the home. If a sagging perimeter were even arguably the cause of the unlevel floor, one would expect to see that sagging in the area of the unlevel floor, but Russo found no such sagging there. He believed the sagging was everywhere in the home except in the area of the kitchen/dining room.

8

DISCUSSION

I. *STANDARD OF REVIEW*

We review the court's evidentiary rulings under the abuse of discretion standard: "As a general matter, a trial court is vested with broad discretion in ruling on the admissibility of evidence. The court's ruling will be upset only if there is a clear showing of an abuse of discretion, i.e., that the court exceeded the bounds of reason." (*In re Marriage of Slayton & Biggums–Slayton* (2001) 86 Cal.App.4th 653, 661.

As we have noted in footnote 1, *ante*, in reviewing Hallmark's claim that there was no substantial evidence to support the jury's verdict we view the entire record in the light most favorable to the judgment to determine whether it contains reasonable, credible, and solid evidence to support the trier of fact's finding. (*People v. Davis, supra,* 10 Cal.4th at p. 509.)

II. *ANALYSIS*

A. *Exclusion of Evidence of Sheeler's Settlement*

Hallmark claims that the trial court should have admitted evidence that Sheeler settled with Alaimo in order to demonstrate Sheeler was biased against Hallmark. We reject this contention.

1. *Background*

Prior to the first trial, APMH and Sheeler entered into a settlement, pursuant to which they paid a total of $22,000 to Alaimo, Sheeler paying $8,500 of that amount. Sheeler's insurance company made the payment on his behalf. Sheeler did not pay any money toward that settlement.

9

The court in this action conducted an Evidence Code section 402 hearing to address the fact Hallmark sought to use Sheeler's settlement with Alaimo to show bias on the part of Sheeler. During the hearing Sheeler testified that it was his insurance company's decision to settle, not his:

> "Q. And the outcome of the suit was your agreement to settle; is that correct?
>
> "A. Not my agreement. My insurance company."

He testified he did not have any say in whether or not his insurance company paid any money to settle the dispute. Sheeler was actually opposed to the settlement because he felt that he had not done anything wrong.

The court concluded there was no evidence of bias on the part of Sheeler because Sheeler was against the idea of the settlement:

> "The Court: . . . I don't think there's bias. He didn't want to settle it.
>
> "Mr. Perryman: Your Honor, he thought Hallmark was suing him. He didn't—
>
> "The Court: He didn't want to settle. The man is disgusted with the settlement. He didn't think he had a responsibility. He didn't want to settle it. You can't use it as bias. There's just no way."

2. *The court did not err in excluding evidence of the settlement*

While evidence of a settlement agreement is inadmissible to prove liability, it is admissible to show bias or prejudice of an adverse party. (*Zelayeta v. Pacific Greyhound Lines, Inc.* (1951) 104 Cal.App.2d 716, 729.)

In support of its claim that that it was harmed by not being able to rely upon the settlement as evidence that Sheeler was biased against the company, Hallmark relies on

10

*Everman v Superior Court* (1992) 8 Cal.App.4th 466 (*Everman*). That decision, however, is inapposite.

In *Everman*, this court held a trial court had abused its discretion when it denied a good faith settlement motion in a nonsliding scale settlement because the settlement required one of the settling defendants to remain in the lawsuit and participate at trial. In *Everman* the plaintiff was injured when his automobile was struck by an employer-owned vehicle being driven by an employee. The plaintiff sued the employer, the employee, a third motorist and the City of Encinitas, which had designed and maintained the road. (*Everman, supra,* 8 Cal.App.4th at pp. 468-469.)

The plaintiff settled with the employer and the employee. Under the agreement with the employer, the employer paid policy limits on behalf of itself and its employee. (*Everman, supra,* 8 Cal.App.4th at p. 469.) The employee driver entered a second agreement which required him to participate in trial. (*Id.* at pp. 469–470.) The condition was imposed by the plaintiff to prevent the remaining defendants from making an "empty chair" argument. (*Id.* at p. 470.) The trial court denied a good faith settlement motion because it found the settlement collusive, noting that a person who had fully settled and was insulated from further liability would sit in the case taking a position on behalf of the plaintiff. (*Id.* at p. 468.)

Upon a petition for writ of mandate, we concluded that if a settlement is otherwise within the *Tech–Bilt, Inc. v. Woodward–Clyde & Associates* (1985) 38 Cal.3d 488 "ball park," it is not subject to disapproval solely because it provides for the continued participation in trial by the settling defendant. (*Everman, supra,* 8 Cal.App.4th at p. 473.)

11

We further concluded that while participation at trial was not collusive as a matter of law, the settling defendant's position as a general rule should be revealed to the court and the jury to avoid committing a fraud. (*Id.* at pp. 471–472.) In doing so, we relied on *Pellett v. Sonotone Corp.* (1945) 26 Cal.2d 705, in which a defendant had received a covenant not to execute in exchange for his agreement to defend the action at trial. The *Pellett* court recognized the potential for fraud in concealing the agreement from the court and jury but stated that under the circumstances presented, the court and other parties were fully informed. The court or jury could therefore weigh the settling defendant's testimony "in the light of the knowledge that, since the agreement provided that a judgment could not be enforced against him, he was not a witness who was adverse to the plaintiff." (*Id.* at p. 713.)

Here, by contrast, the settling party Sheeler was *opposed* to the settlement that his insurance company had funded. The purpose of disclosing a settlement to a jury is to allow them to assess whether the pretrial settlement shows a bias on the settling defendant's part.

If Sheeler had paid his own money to settle the cross-complaint and then testified that the defects were not caused by the installation, Hallmark could point to that settlement and claim that Sheeler actually was the cause of the defects in the home and that is why he settled. But in this case Sheeler was opposed to the settlement and so there was no evidence of bias in favor of Alaimo resulting from the fact of the settlement.

Hallmark claims that the court's ruling on the admissibility of the settlement barred Hallmark from challenging Alaimo's bias against Hallmark and in favor of Sheeler.

12

However, when Hallmark cross-examined Alaimo with a letter from Alaimo to Sheeler criticizing Sheeler's work, it disclosed a dispute between Alaimo and Sheeler over payment due to Sheeler for his installation work. Hallmark thereafter argued that Alaimo believed Sheeler had not installed the home correctly. Thus, Hallmark's own evidence showed that Alaimo was biased *against* Sheeler.

Moreover, even if we were to conclude that the court erred in excluding evidence of the settlement, that error was harmless. A trial court's error in excluding evidence is ground for reversing the judgment only when the appellant "'demonstrates "a miscarriage of justice"—that is, that a different result would have been probable if the error had not occurred.'" (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) Because Hallmark was allowed to cross-examine Alaimo on her criticism of Sheeler, even if the trial court's exclusion of Hallmark's purported "bias" evidence was erroneous, Hallmark cannot show that a different result would likely have been obtained but for that ruling.

B. *Sheeler's Testimony Regarding Cause of Defects*

Hallmark asserts that it was error to allow Sheeler to testify as an expert because he was not an engineer. Specifically, Hallmark challenges his testimony, as detailed, *ante*, that the gap in the ridgeline of the manufactured home, making the two halves of the manufactured home not come together, was typically a manufacturing problem. We reject this contention.

13

1. *Background*

Sheeler testified, *without objection*, as follows concerning the cause of the defects in the home:

"Q. . . . Have you seen these kinds of gaps before?

"A. Not like that, no. Sometimes there will be an inch maybe. That's the very worst or three quarters sometimes.

"Q. Was this the worst you've ever seen?

"A. Yes.

"Q. Do you know what causes those?

"A. It's just wood. You know, it's the way it's manufactured, you know."

Hallmark's attorney thereafter objected that Sheeler was testifying as an expert. In response, the court noted that that testimony had been given without objection:

"Mr. Perryman: I don't mind, hey, this is the biggest dormer I've ever seen. The problem with the gap because of this dormer. I think it was built wrong at the factory when there was no foundation I think is not proper.

"The Court: He's gone into that with no objection."

The court also noted that the subject of Sheeler's testimony was not particularly complex and that with some foundation, he should be able to testify on the subject:

"The Court: . . . Let's face it, these are not NASA rockets, right, what we're talking about here. And these are pretty basic construction items, these mobile home double wide[s]."

14

The following exchange then took place between the court and counsel:

"The Court: You're going to ask what is this problem based on, and he is going to say I think it's something that came from the factory as opposed to the installation at the job site.

"Mr. Descalso: Yes. Was this an installation issue or factory.

"The Court: You're saying he's not qualified to testify to that?

"Mr. Perryman: That's correct.

"The Court: It's not a very complicated question. If he does this stuff for a living, he's putting the home together, I think he should be, with maybe a little more foundation as to how much he's been doing this, how long, how many he's done, he should be able to testify I saw at the site it looked like something that would come from the factory. It doesn't appear to me to be something that was done at the work site. I think he can properly testify to that."

Thereafter, Sheeler testified that, based on his over 40 years' experience and thousands of installations, including Hallmark homes, he knew it was a factory defect:

"Q. . . . With this gap, the size of this gap as compared to the other gaps you had encountered in the 20 to 25 percent of your installations, did you determine that that was an installation problem as opposed to something that was built at the factory?

"A. I knew it wasn't an installation problem. It was a factory problem, factory defect."

2. *Sheeler was qualified to testify as to the cause of the defect*

Evidence Code section 720, subdivision (a), establishes the qualifications of an expert: "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates."

15

The key in allowing opinion testimony is proper foundation and relevance to the subject matter to which the testimony relates: "Once qualified, an expert may give an opinion '[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness . . . .'" (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1117.)

Further, Evidence Code section 801, subdivision (a) provides guidelines for when expert testimony is allowed: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ."

Moreover, "[t]he trial court has considerable latitude in deciding whether a person has sufficient knowledge, skill, experience, training or education to qualify as an expert. [Citation.] On appeal, this determination will not be upset absent a manifest abuse of discretion." (*People v. Denney* (1984) 152 Cal.App.3d 530, 546-547.)

We conclude the court did not err in concluding Sheeler had the requisite special knowledge, skill and experience to know when a construction problem encountered in the field is caused by the factory or by installation. As noted, *ante*, Sheeler testified as to his over 40 years of experience installing manufactured homes, during which he installed thousands of homes. Moreover, as the court noted, the subject was not particularly complex, such that it would require the testimony of an engineer. These facts laid an adequate foundation for Sheeler's testimony.

C.  *Substantial Evidence Supports the Judgment*

Hallmark asserts that there is no substantial evidence to support the jury's finding that the manufactured home was not of the quality generally accepted in the industry. This contention is unavailing.

Hallmark ignores Alaimo's evidence, detailed in the factual background, *ante*, that provides substantial evidence to support the verdict.  Instead, Hallmark relies only on evidence it claims supports its *defense case*.

It matters not that there may have been a conflict in the evidence.  Rather, the inquiry is whether or not the record as a whole demonstrates the existence of substantial evidence, *contradicted or not*, which supports the findings of the jury.  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

D.  *Alaimo's Request for Attorney Fees on Appeal*

Alaimo asserts that the Song-Beverly Act awards attorney fees and costs to the successful consumer in litigating a claim under its provisions, and on this basis the court awarded Alaimo attorney fees as the prevailing party.  She asserts that this court should, on that basis, award her the attorney fees she has incurred on this appeal.

"[I]t is established that fees, if recoverable at all—pursuant either to statute or parties' agreement—are available for services at trial *and on appeal*."  (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 637, italics added.)  Alaimo is the prevailing party on appeal, and thus she is entitled to fees and costs.

However, "[a]lthough this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees."  (*Security Pacific National*

17

*Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498.)  Accordingly, Alaimo's claim for attorney fees on appeal shall be addressed by the trial court upon remand.

DISPOSITION

The judgment is affirmed.  The matter is remanded to the trial court for a determination of Alaimo's attorney fees incurred on appeal.  Alaimo shall recover her costs on appeal.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.